## IN THE COURT OF APPEALS OF IOWA

No. 13-0618
Filed August 27, 2014

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**DAVID HOWARD ROONEY,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Pottawattamie County, Richard H. Davidson, Judge.

Defendant appeals his conviction for burglary in the third-degree. **AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Vidhya Reddy, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Tyler Buller, Assistant Attorney General, Matthew Wilber, County Attorney, and Tom Nelson, Assistant County Attorney, for appellee.

Considered by Vogel, P.J., and Tabor and McDonald, JJ.

**VOGEL, P.J.**

David Rooney appeals his conviction for burglary in the third degree. He claims there was insufficient evidence supporting the jury's conclusion he "entered" an "occupied structure" as defined in the Iowa Code, and that the district court erred in submitting the "overnight accommodation" and "storage or safekeeping anything of value" alternatives defining an occupied structure to the jury. He further claims the court erred in overruling his motion for mistrial based on alleged prosecutorial misconduct during closing argument. We conclude the house in this case, although abandoned, satisfies the definition of "occupied structure," and therefore sufficient evidence supported Rooney's burglary conviction. Additionally, no comments made by the prosecutor during closing arguments rose to the level of misconduct such that Rooney was denied a fair trial, and therefore the district court properly overruled Rooney's motion for mistrial. Consequently, we affirm.

**I. Factual and Procedural Background**

On November 4, 2012, Council Bluffs Fire Department responded to a fire at a dilapidated city-owned house. The fire department investigator found signs of forcible entry. He also found indicia that copper wiring and a cast-iron radiator had been removed from the house. Witnesses reported seeing two men loading a radiator or heat register from the house onto a jimmy-rigged flatbed pickup truck a few hours before the fire started. Law enforcement later discovered the reported vehicle. Two men were with the vehicle, one of which was Rooney. Although Rooney denied any involvement with the fire, he admitted to "being at the property that day scrapping metal."

The house in question had not been lived in since 2002, and since 2007 the house had been owned by the City of Council Bluffs (City). The house was built about 1890, and was thought to be the oldest residence in Council Bluffs. The goal was to preserve its historic value; however, all efforts to secure a developer to restore the house had failed. On the date of the fire, the house did not have any power or electricity, insulation was down, walls and wires were exposed, the drywall was punctured, and the pipes were disconnected. The investigator for the fire department described the house as being in disrepair, vacant, and completely boarded up, while a neighbor described the house as "just an old, abandoned, nobody-lives-there house, falling apart, boarded up." While the house was unoccupied, evidence in the record showed transient people occasionally spent the night there.

On December 12, 2012, Rooney was charged with burglary in the third degree, in violation of Iowa Code sections 713.1 and 713.6A(1) (2011). Following a jury trial, he was convicted on February 20, 2013, and sentenced to a term of incarceration not to exceed five years. Rooney appeals.

## II. "Entering" an "Occupied Structure"

Rooney first claims insufficient evidence supported the jury's verdict he "entered" an "occupied structure" as contemplated in Iowa Code section 713.1, because, he asserts, an abandoned house does not meet the definition of an occupied structure under section 702.12.

### A. Standard of Review

"Sufficiency of evidence claims are reviewed for a correction of errors at law." *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012). "In reviewing

challenges to the sufficiency of evidence supporting a guilty verdict, courts consider all of the record evidence viewed 'in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence.'" *Id.* (citation omitted). We will uphold a verdict if it is supported by substantial evidence. *Id.* "Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt." *Id.*

### B. Definition of "Occupied Structure"

Iowa has historically followed the common law approach to defining burglary. *See id.* At common law, only a "dwelling house" could be the subject of the offense of burglary. *See State v. Pace*, 602 N.W.2d 764, 769 (Iowa 1999). The General Assembly expanded the scope of the burglary statute in 1978 beyond "dwelling houses" to "occupied structures." *Id.* The Iowa Code now defines burglary as follows:

> Any person, having the intent to commit a felony, assault or theft therein, who, having no right, license or privilege to do so, enters an occupied structure, such occupied structure not being open to the public, or who remains therein after it is closed to the public or after the person's right, license or privilege to be there has expired, or any person having such intent who breaks an occupied structure, commits burglary.

Iowa Code § 713.1. Iowa Code section 702.12 defines an "occupied structure" in the following manner:

> [A]ny building, structure, appurtenances to buildings and structures, land, water or air vehicle, or similar place adapted for overnight accommodation of persons, *or* occupied by persons for the purpose of carrying on business or other activity therein, *or* for the storage or safekeeping of anything of value. Such a structure is an "occupied structure" whether or not a person is actually present.

(Emphasis added.)

The statute is written in the disjunctive, such that proof is required on only one of the three alternatives. *See Powers v. McCullough*, 140 N.W.2d 378, 385 (Iowa 1966) ("With few exceptions the doctrine is well settled that when two or more acts are enumerated in a statute disjunctively, and are not repugnant to each other, they may be alleged conjunctively in an indictment or information without duplicity."). At issue here is the jury instruction defining a structure as "occupied" if it is either "adapted for overnight accommodations" or for the "storage and safekeeping of anything of value."

### C. Adapted for Overnight Accommodations

The record supports this house as meeting the definition of "occupied structure" under the "adapted for overnight accommodations." It is undisputed that the house in question is a structure that was built for overnight accommodations. Therefore, because the statute is written in the disjunctive, the house satisfies the definition of occupied structure under this alternative. *See* Iowa Code § 702.12 ("An 'occupied structure' is any building, structure, appurtenances to buildings and structures, land, water or air vehicle or similar place adapted for overnight accommodation of persons"); *see also State v. Sinclair*, 622 N.W.2d 772, 780 (Iowa Ct. App. 2000) (holding sufficient evidence supported the defendant's burglary conviction where he entered the home of his ex-wife and proceeded to commit several felonies).[1]

---

[1]The two-prong test of whether a building is an occupied structure found in *Pace*, 602 N.W.2d at 769, is utilized when the structure is not clearly "adapted for overnight accommodations of persons. *See id.* (analyzing a porch, stoop, and driveway under the test, and noting that these were appurtenances to the house). *See also Sanford*, 814

Regardless of its poor condition, one of a house's primary purposes—abandoned or otherwise—is accommodating people to stay overnight.[2] As the evidence in this case demonstrated, people did occupy the house on an overnight basis, albeit they were transients who, regardless of the houses dilapidated condition, sought shelter. Aware of this use, the City had contacted personnel with an emergency homeless shelter to help board up the site. One neighbor testified that although the house was boarded up, it had been broken into on many occasions. Boards would be down and doors open on a fairly routine basis. The neighbor further stated that in the months before the eventual demolition of this house, her husband "had ran a few people out of there he seen going in there" and had called the police.

This testimony aligns with the fact that abandoned houses are notorious for being "occupied" by trespassers, sometimes in the context of the perfect shelter to harbor illegal activity. *See In re A.K.*, 825 N.W.2d 46, 53 (Iowa 2013) (finding juvenile did not commit an assault against victim who followed juvenile to an abandoned house); *State v. Cline*, 717 N.W.2d 277, 279 (Iowa 2000) (noting ongoing drug activity and methamphetamine lab at fire-damaged, uninhabitable house); *State v. Hustead*, 538 N.W.2d 867, 869 (Iowa App. 1995) (describing burglary suspects' use of an abandoned farm house to harbor stolen property). The conclusion that an abandoned, seemingly uninhabitable house would fit into

_____

N.W.2d at 615 (applying the test to determine whether a vehicle was an occupied structure). Because a house is the quintessential occupied structure, the two-pronged test set forth in *Pace* does not apply.

[2] We acknowledge the prosecutor, in his closing argument, seemed to concede that the house was no longer adapted for overnight accommodations because it was a "bad house." However, that comment was not evidence, and we agree with the district court's determination the State's case created a jury question as to whether the house was adapted for overnight accommodations.

the broad scope of an "occupied structure" squares with the traditional purpose of our burglary laws, which are "designed primarily to protect against the creation of a situation dangerous to personal safety caused by unauthorized entry." *Sanford*, 814 N.W.2d at 618 (citation omitted). It is also consistent "with the fundamental common law concept of burglary as an offense against security of occupancy," given that "[t]he laws are primarily designed . . . not to deter the trespass and the intended crime, which are prohibited by other laws, so much as to forestall the germination of a situation dangerous to personal safety." *Pace*, 602 N.W.2d at 768, 771. Consequently, this record supports that an abandoned house, even if it is condemned, can and did harbor persons, such that it satisfies the definition of an occupied structure for the purpose of our burglary statute.[3]

### D. Adapted for Storage or Safekeeping Items of Value

The evidence presented also showed the house satisfied the definition of "adapted for storage or safekeeping items of value" alternative to "occupied structure." At trial, the jury heard testimony regarding certain historical features of the property. Tina Hochwender, Community Project Coordinator for the City of Council Bluffs and the individual overseeing the house, testified that the house contained special historic features, including the carpentry and the fireplace mantel. When asked why the City took steps to secure the property by boarding it up, she testified: "Because there were items in the property that were historical and were trying to be maintained and kept, because we could receive additional

---

[3] We note the legislature has defined an "occupied structure" under section 702.12 broader than a "dwelling" under section 702.10, which is defined as a structure "adapted for overnight accommodation of persons, and actually in use by some person or persons as permanent or temporary sleeping quarters, whether such person is present or not."

financial assistance if there's historical significance to this site." This testimony shows the interior features of the house had historical significance and intrinsic value. It also had extrinsic value due to the City's ability to receive more financial assistance by maintaining those features. Hochwender testified that on many occasions the City was notified that boards had been removed, "[a]nd so we assumed someone probably broke in so we would call people and have them secure the site." The reason for buying and attempting to protect the house from intruders was to store and keep safe those historic interior features. Even after the November 4 fire, while the house was slated for demolition, Hochwender testified: "People still wanted stuff out of there, so it still had value."

Furthermore, Iowa case law broadly interprets the language of section 702.12. *See State v. Hill*, 449 N.W.2d 626, 628 (Iowa 1989) ("By virtue of the fact that some of the business activities of the automobile parts store were carried on within the fenced enclosure, and the fact that the store used the enclosure to store used parts of some value, we find that the enclosure was an 'occupied structure.'"); *State v. Williams*, 409 N.W.2d 187, 188–89 (Iowa 1987) (holding entry into a camper shell mounted on the bed of a pickup truck to remove tires stored in shell constituted burglary); *State v. Sylvester*, 331 N.W.2d 130, 132 (Iowa 1983) (holding that "storage or safekeeping of anything of value" includes "those portions of enclosed delivery trucks containing products to be carried and delivered. An enclosed delivery truck does not only transport products; it holds them in safekeeping until they are removed in their turn for delivery."). Additionally, this record revealed that Rooney admitted to being at the property on November 4, "scrapping metal," after which copper wiring and a

cast-iron radiator were missing from the house. Given our case law and the testimony offered, sufficient evidence supported the conclusion the house was used for the storage or safekeeping items of value.

### E. "Entering" the House

The record also conclusively demonstrated Rooney "entered" the house. Two unrelated witnesses reported seeing two individuals loading a radiator into a pickup truck. The investigator for the fire department noticed one of the radiators from the house was missing. When the pickup truck was eventually discovered and Rooney was interviewed, Rooney admitted to being at the house "scrapping metal." Therefore, considering "all of the record evidence viewed in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence," *Sanford*, 814 N.W.2d at 615, a rational jury could conclude Rooney "entered" the house. Therefore, sufficient evidence supported the jury's verdict that Rooney entered an occupied structure.

## III. Jury Instructions

Rooney further contends the district court erred in overruling his objection and submitting to the jury the "adapted for overnight accommodation" and "storage or safekeeping of anything of value" alternatives for the definition of "occupied structure." Challenges to jury instructions are reviewed for correction of errors at law. *State v. Anderson*, 636 N.W.2d 26, 30 (Iowa 2011). "Our review is to determine whether the challenged instruction accurately states the law and is supported by substantial evidence." *State v. Hanes*, 790 N.W.2d 546, 548 (Iowa 2010).

As noted above, sufficient evidence supported both the "adapted for overnight accommodations" and "storage or safekeeping anything of value" alternatives. Consequently, the district court properly overruled Rooney's objection.

## IV. Prosecutorial Misconduct

Finally, Rooney contends the district court erred in overruling his motion for mistrial based on alleged prosecutorial misconduct during closing argument. Rooney takes issue with the following statement:

> You saw what the house was like, and people just—they're, like, who cares. "Let's go into this house. We don't need permission. Let's just go take it." Okay. So that's what happened in this particular case except that people do care. They did not have permission. And when he entered with the specific intent to commit a theft and later was discovered and confessed to it, people do care. And that's why we're here. Okay.
>
> . . . .
>
> With regard to whether or not this case is that big of a deal, okay, ladies and gentlemen, what's really going on here? Things taken from a vacant house. Who cares? I want to give you a reason to care. Tina Hochwender cared. She was on that stand when she was questioned with regard to this was a vacant old house, was basically a line of questioning. She didn't appreciate it. She cared about that house. She wanted to see something done with it. She cared that it was broken into. She reported it. She got calls right up to a couple weeks until it was demolished about trying to do something with this house. Okay. So who cares? Tina Hochwender cares about what happens in this case and what the verdict is and what people were doing in this house. So I want to give you a reason to care. With her, and also, ladies and gentlemen, the insinuation that a vacant house cannot be burglarized should offend you. Just because this was a vacant old house doesn't mean people should be able to enter without authority or permission and take what they wanted. Okay. Vacant houses, people care about vacant houses. People cared about this vacant house. So to say that metal has no value or try to get off on some type of technicality like that, ladies and gentlemen, that should offend you.
>
> Burglary, occupied structure, things were deemed an occupied structure such as garages, occupied structure such as

storage units, things like that. They are deemed occupied structures. Vacant houses are deemed occupied structures for a reason. That's so when somebody is alleged to commit a crime, we have jury instructions to give you and a way in order for the elements to be neat in order to prove somebody guilty. So that house was an occupied structure just because it was a vacant house. Don't not care.

We review rulings on a motion for mistrial for abuse of discretion. *State v. Greene*, 592 N.W.2d 24, 30 (Iowa 1999). An abuse of discretion will be found "where (1) there is misconduct, and (2) the defendant was so prejudiced by the misconduct as to deprive the defendant of a fair trial." *Id.*

We do not agree with Rooney's contention the prosecutor's comments rose to the level of misconduct. The closing argument responded to the defense's theory of the case, which argued against the jury finding the abandoned house to be an "occupied structure" within the meaning of the burglary statute, and noting how the house was unoccupied and in a state of disrepair. This was a permissible strategy on the part of the State. *See State v. Thornton*, 498 N.W.2d 670, 674 (Iowa 1993) ("A prosecutor is not required to sit mute and let the defendant's interpretation of evidence go unchallenged."). We therefore conclude no misconduct took place and Rooney was not deprived of a fair trial. *See Greene*, 592 N.W.2d at 30. Consequently, we affirm the district court's denial of Rooney's motion for mistrial.

Having considered Rooney's arguments, we affirm his conviction and sentence for burglary in the third degree.

**AFFIRMED.**

Tabor, J., concurs; McDonald, J., dissents.

**MCDONALD, J.,** (dissenting)

When viewed in the light most favorable to the State, there is not substantial evidence this waiting-to-be-bulldozed structure was an "occupied structure" within the meaning of Iowa Code sections 702.12 and 713.1. The contrary conclusion ignores the common law foundations of the statute, the statutory text, controlling authority interpreting the statutory text, and the purpose of the statute. Accordingly, I respectfully dissent.

"We interpret statutes consistent with common law unless the language of the statute clearly negates the common law." *State v. Pace,* 602 N.W.2d 764, 771 (Iowa 1999). At common law, burglary was "defined as breaking and entering any dwelling-house by night with intent to commit a felony therein." Oliver Wendell Holmes, Jr., The Common Law 74 (Dover Publ'ns, Inc. 1991) (1881). "The object of punishing such a breaking and entering [was] not to prevent trespasses, even when committed by night, but only such trespasses as [were] the first step to wrongs of a greater magnitude, like robbery or murder." *Id.* Burglary at the common law vindicated the "right of habitation," that is the right of use. 4 William Blackstone, Commentaries on the Laws of England 223 (1769), *available at http://avalon.law.yale.edu/subject_menus/blackstone.asp.* Thus, common law burglary did not include "breaking open of houses wherein no man resides." *Id.* at 225.

Iowa's earliest criminal code essentially mirrored the common law formulation of burglary. *See, e.g., State v. Jones*, 10 Iowa 206, 208 (1859) ("At common law the intent to commit a felony was necessary to constitute the offense of burglary; but under our statute the offense is made to consist in

breaking and entering any dwelling-house in the night time with intent to commit the crime of murder, rape, robbery, larceny or any other crime made felony under our laws."). Iowa Code section 702.12 expanded the types of structures that can be subject to burglary beyond mere dwelling houses to include any "building, structure, appurtenances to buildings and structures, land, water or air vehicle, or similar place . . . ." By necessity, section 702.12 also expanded the interests subject to protection beyond the mere right of habitation. The statute now protects interests in structures "adapted for overnight accommodation of persons, or occupied by persons for the purpose of carrying on business or other activity therein, or for the storage or safekeeping of anything of value." While the scope of property and uses protected by the burglary statute has expanded, the code revisions did not alter the purpose for making burglary a criminal act: to protect a legally cognizable interest in using the place protected.

Our cases interpreting sections 702.12 and 713.1 have reiterated the requirement that the place must have a statutorily defined purpose or use to qualify as an "occupied structure." In *State v. Pace*, our supreme court stated: "our definition of an occupied structure has two prongs. The first describes the type of place that can be the subject of burglary, and the second considers its purpose or use." *Pace*, 602 N.W.2d at 769. The first prong requires evidence the place is the type of place that can be the subject of burglary. The second prong requires evidence the structure has some statutorily recognized purpose or use contemporaneous with entry:

> Burglary was never intended to cover all structures, but only those occupied by reason of some activity occurring in the structure. Although our legislature expanded the definition of

'occupied structure' beyond a common law 'dwelling house' concept, it specifically retained the requirement that the subject matter of burglary be occupied in conjunction with some activity which takes place in the structure.

*Id.* at 771. The contemporaneous purpose or use requirement is consistent "with the fundamental common law concept of burglary as an offense against security of occupancy." *Id.* The contemporaneous purpose or use requirement set forth in *Pace* is not new—our cases have recognized this as an essential element of the offense for over one hundred years. *See e.g., State v. Burns*, 80 N.W. 545 (Iowa 1899) ("At the common law, to break and enter a building, other than a mansion or dwelling house, was not burglary; nor is it under the above statute, unless the enumerated articles are kept therein for the purposes defined. *The particular use to which the building is put, then, is of the essence of the crime*." (emphasis added)).

The majority distinguishes *Pace* on the ground the two-prong test applies only where it is not obvious the place is adapted for overnight accommodation. There is nothing in the common law supporting the distinction. Indeed, the common law is to the contrary. There is nothing in the statutory text supporting the distinction. On the contrary, the plain language of the text shows the enumerated purposes qualify each of the enumerated places. *See State v. Newman*, 313 N.W.2d 484, 488 (Iowa 1981) (Uhelnhopp, J., dissenting) (explaining the first part of the statute describes the types of places subject to burglary and the latter part of the statute qualifies the first). There is nothing in *Pace* supporting the distinction. Indeed, the majority's distinction is directly contrary to *Pace*, which provides the place and purpose tests are elements that

must be proved in all burglary cases. There is nothing in our case law, generally, that supports the distinction. Indeed, our courts repeatedly have required the State to prove an enumerated purpose or use even where the place is the "quintessential" place protected by statute. *See, e.g., State v. Sanford,* 814 N.W.2d 611, 616 (Iowa 2012) (stating "[Defendant's] Dodge Stratus is clearly a land vehicle. This means that the pivotal issue in this case is whether the second prong of the definition found in section 702.12 has been satisfied"); *State v. Sangster*, 299 N.W.2d 661, 663 (Iowa 1980) (holding evidence was sufficient where garage was used to store automobile); *State v. Sylvester*, 331 N.W.2d 130 (Iowa 1983) (applying two-pronged test to delivery truck); *Burns*, 80 N.W. at 545-46 (applying two-prong test to a "building, to wit, a printing office" and holding evidence sufficient where goods, merchandise, and valuable things were kept for sale"); *State v. Dixon*, No. 11-1750, 2012 WL 6193877 (Iowa Ct. App. Dec. 12, 2012) (applying two-prong test to automobile). Other courts have conducted a similar purpose and use analysis when determining whether a house was subject to burglary. *See, e.g.*, *State v. Albert*, 426 A.2d 1370, 1373-74 (Me. 1981) (applying purpose and use test to summer cottage); *Trotter v. State*, 623 S.W.2d 504, 505 (Tex. Ct. App. 1981) (applying purpose and use test to mobile home).

I agree with the majority's attempt to distinguish *Pace* in one limited sense. In the typical case, a house is the quintessential place adapted for overnight accommodation or one of the other enumerated purposes. In the typical case, it is thus very easy for the State to prove the house at issue was adapted for overnight accommodation or used for one of the other enumerated purposes. The majority errs, however, in concluding that because it is typically

easy for the State to prove a house is used for an enumerated purpose, then purpose is no longer an element of the offense. As set forth above, that conclusion is contrary to controlling authority. That conclusion is also not consistent with the jury instruction given in this case, in which the jury was instructed the State was required to prove beyond a reasonable doubt this house was used for a particular purpose. Taken to its final conclusion, the majority's interpretation of *Pace* would require the jury be instructed that a house, as a matter of law, is a place adapted for overnight accommodation. Given my conclusion that the State must prove a statutorily recognized purpose or use at the time of entry, I cannot conclude there is substantial evidence supporting the verdict.

The State contends the property was adapted for overnight accommodation of persons. On the date Rooney allegedly burgled the property, it is not disputed the property was not habitable. The majority sets forth with sufficient detail the physical condition of the property. Three things should be emphasized, however. First, the City had boarded the house with plywood to prevent people from entering the property because the City was not using, nor did it want to use, the property for overnight accommodation. Second, on the offense date, the property already was past a scheduled demolition date. Third, the property was demolished several days after the offense date. Thus, at the time of Rooney's entry, the City had no intent to use the property for overnight accommodation.

The majority seems to take the position that because "[o]ne of a house's primary purposes—abandoned or otherwise—is accommodating people to stay

overnight," then a house is by definition an occupied structure. This is contrary to the common law rule that burglary did not include "breaking open of houses wherein no man resides." 4 Blackstone at 225. This is contrary to the contemporaneous purpose or use requirement set forth in over one hundred years of precedent as articulated in *Burns* and *Pace*. This is contrary to the rationale for making burglary a criminal act, which is to protect activity and use inside the building and not just the building itself. *See Pace*, 602 N.W.2d at 768 (stating burglary "was not designed to protect property or ownership, [but] rather the notion that people should be able to feel secure in their homes"). This is contrary to our rules of statutory construction. The majority's interpretation renders the contemporaneous purpose or use requirement in the statute a nullity. If the statute does not require proof of purpose or use contemporaneous with entry, then the statutory qualifications serve no independent purpose. *See State v. Nicoletto*, 845 N.W.2d 421, 427 (Iowa 2014 ("[W]e interpret statutes in a manner to avoid absurd results and to avoid rendering any part of an enactment superfluous.")

The majority also relies on the "fact that abandoned houses are notorious for being 'occupied' by trespassers, sometimes in the context of the perfect shelter to harbor illegal activity," as evidence abandoned houses are occupied structures. While it may be true that some abandoned properties are so used, to conclude that all or even substantially all are so used appears to be an adjudicative fact of which we should not take judicial notice. *See State v. Stevens*, 719 N.W.2d 547, 550 (Iowa 2006) ("To be capable of being judicially noticed, a matter must be of common knowledge or capable of certain

verification." (citation omitted)). Second, and related, the conclusion suffers the fallacy of division. We cannot soundly conclude this particular building was occupied by trespassers merely because some other abandoned buildings may be occupied by trespassers. Finally, the fact trespassers may use abandoned properties, in general, and may have used this property, in particular, is not relevant. "[B]urglary is an invasion of the possessory property rights of another . . . ." *State v. Hagedorn*, 679 N.W.2d 666, 671 (Iowa 2004) (citation omitted); *see Pace*, 602 N.W.2d at 768 (stating burglary is not intended to protect property); *State v. Morrisey*, 22 Iowa 158, 160 (Iowa 1867) (holding the injury to be protected is to the owner of the property); *State v.* Tyerman, No. 09-0113, 2010 WL 787935, at * 12 (Iowa Ct. App. Mar. 10, 2010) (stating the purpose of the burglary law is to protect the person with custody and control of the property (citation omitted)). The statutory requirement of contemporaneous purpose or use refers to the purpose or use put to the property by the party with a legally cognizable interest in the property. Trespassers have no cognizable interest in this property; their use of the property is immaterial.

The only evidence material to the overnight accommodation prong was the City—the entity with legal interest in the property—had concluded the property was not suitable for overnight accommodation, had boarded up the property to prevent the property being used for overnight accommodation, and had entered into an agreement to raze the property. Although his statement to the jury is not evidence, it should be noted the prosecutor concluded there was insufficient evidence supporting the overnight accommodation prong and the purpose of the statute was not to protect past purposes or uses:

I'm kind of more of a cut to the chase type of guy. This was a bad house. Nobody was living there. I'm not saying it was adapted for accommodations. I couldn't say why don't you guys find for me on that element because at one time it was adapted for overnight accommodations. That's not what the law is designed to [do]. I don't think that really is fair here.

The prosecutor's statement to the jury was correct. There is nothing in the record to support the verdict on this ground.

The State argues the property was an occupied structure because the property was being used for storage or safekeeping things of value. The State argues that because the evidence showed the structure had fixtures or components (wiring, metal, mantel) with scrap value, then the structure was used for the storage or safekeeping things of value. The fact the house itself had scrap value is not material to the question of whether the house was adapted "for the storage or safekeeping of anything of value." The common understanding of the phrase "adapted for storage or safekeeping of anything of value" would seem to mean storing or safekeeping something of value inside the structure but separate and distinct from the structure. In common usage, one would not state she "stores" her copper wiring within the walls of her home; the copper is part and parcel of the structure itself and not something placed for storage or safekeeping in the structure.

Even assuming, however, that there were fixtures of other parts of this property that were effectively being stored or maintained, the City was no longer using this property for this purpose on the date of the offense. On the date of the offense, the building was past its scheduled demolition date. While Hochwender testified the City previously had tried to salvage items from the property, it had

abandoned those plans by the offense date. Hochwender testified no person went to retrieve anything of value between the offense date and the date of demolition. The fact the building was demolished without the alleged things of value being retrieved is contrary to the concept of "storing" and "safekeeping," both of which connote keeping the items for future use rather than destruction. *See* Webster's Third New Int'l Dictionary 1998 (1993) (defining "safekeeping" as "the act or process of preserving in safety from injury, loss, or escape."); see *Storage Definition*, Merriam-Webster, www.merriam-webster.com/dictionary/storage (last visited August 11, 2014) (defining "storage" as "the act of storing: the state of being stored; especially: the safekeeping of goods in a depository (as a warehouse)"). S*ee also Pace*, 602 N.W.2d at 772 ("Additionally, the word "storage" connotes some degree of permanency, not transience.").

The cases from other jurisdictions upon which the State relies are distinguishable. In *Askew v. Commonwealth*, No. 2008-CA-000240-MR, 2009 WL 875059, at *2 (Ky. Ct. App. Apr. 3, 2009), the court affirmed a burglary conviction where the defendant burgled "an uninhabited, dilapidated, condemned house." However, Kentucky's burglary statute defined "building" as "any structure that meets the definition of a building as used in common parlance, including abandoned, uninhabitable, and condemned structures" *Id.* at *1. Unlike Iowa, Kentucky law does not require proof of "activity which takes place in the structure." *See Pace*, 602 N.W.2d at 771. In *Herrick v. State*, 965 P.2d 844 (Kan. Ct. App. 1998), the court affirmed a burglary conviction regarding a dilapidated home, but not so dilapidated, as here, that it raised the issue of

whether it could be used as a human habitation. *See id.* at 848. Further, the court noted its burglary statute had a "broad definition" and it was sufficient to show the building at one point in time "was intended for use as a home." *Id.* at 847. In contrast, our cases hold there must be some use or purpose contemporaneous with the offense. *See Pace*, 602 N.W.2d at 771. The last case relied on by the State, *State v. Kowski*, 423 N.W.2d 706, 707 (Minn. Ct. App. 1988), involved the burglary of an under-construction summer cabin used by the victim as a temporary residence. The burglary statute in *Kowski* encompassed buildings used as a "permanent or temporary residence." 423 N.W.2d at 709. I conclude such a structure would fall within the ambit of the burglary statute because the structure was to be used as a place for overnight accommodation. In our case, however, the property owner concluded the property no longer had any use, unless waiting for demolition is considered a use.

Finally, the State argues the failure to include dilapidated buildings as falling within the burglary statute will incent crime against blighted property. While that policy consideration is important, the State's fear is overstated. First, the facts of this case are limiting. Second, and related, there is a material distinction between blighted property and property scheduled for demolition. In the latter case, the person with a cognizable interest in the property determined the property no longer has a purpose or use of any sort. Third, the State's argument is premised on a false dichotomy: either Rooney's acts constituted burglary or the acts are not subject to criminal sanction. Other criminal statutes—including, for example, theft, criminal mischief, and trespass—can be

used to advance the State's interest in protecting blighted properties. Likewise, other criminal statutes can be used to protect the State's interest in deterring conduct that may occur in blighted property.

As a general rule, "acts are rendered criminal because they are done under circumstances in which they will probably cause some harm which the law seeks to prevent." Holmes at 75. "The test of criminality in such cases is the degree of danger shown by experience to attend that act under those circumstances." *Id.* The act of burglary is rendered criminal to protect a legal interest in the use of the place subject to protection. Where, as here, the possessor concluded the property had no purpose or use and had contracted for the property's destruction, the harm the law seeks to prevent no longer exists. Accordingly, I respectfully dissent.